# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF FLORIDA

### Case No.: 18-CV-80558-MIDDLEBROOKS

THE LEBBIN-SPECTOR FAMILY TRUST,
by and through its Trustees, Roger M. Lebbin
and Carole Sue Lebbin,

       Plaintiff,

v.

TRANSAMERICA LIFE INSURANCE
COMPANY,

       Defendant.

_____/

## ORDER ON CROSS MOTIONS FOR SUMMARY JUDGMENT

THIS CAUSE comes before the Court on the Motion for Summary Judgment filed by Gary H. Lebbin and the Lebbin-Spector Family Trust ("Plaintiff" or the "Trust")on January 30, 2019. (DE 113). THIS CAUSE also comes before the Court on the Amended Motion for Summary Judgment filed by Defendant Transamerica Life Insurance Company ("Defendant" or "Transamerica") on March 22, 2019. (DE 171). Both motions are fully briefed. (DE 141; DE 155; DE 176; DE 179).

For the reasons set forth below, Plaintiff's Motion is granted, and Defendant's Motion is granted in part and denied in part.

## BACKGROUND

Garry H. Lebbin was born on September 6, 1917 and married his wife Bernice after moving to the United States in 1938. (Plaintiff's Statement of Undisputed Facts, DE 124 ¶¶ 1–2). After a series of sales meetings with Transamerica agents in Florida, Gary Lebbin purchased two insurance policies from Transamerica. (DE 124 ¶¶ 5, 7; Defendant's Statement of

Undisputed Facts, DE 172 ¶ 3).  Policy No. 92324057, issued in 1990, bears a face value of $2,000,000, and Policy No. 92387187, issued in 1991, bears a face value of $1,200,000 (collectively, the "Policies").  (DE 124-10; DE 124-11).  The terms of the Policies are identical.  (DE 124 ¶ 8; DE 172 ¶ 13).  The Trust alleges that the Policies were "marketed, sold, and represented" as "for life," and that Gary Lebbin purchased the Policies based on "representations concerning [their] permanent nature."  (Am. Compl. ¶¶ 18, 26).

Gary and Bernice Lebbin created the Lebbin-Spector Trust ("Plaintiff") to own the Policies.  (DE 124 ¶ 6; DE 172 ¶ 23).  Their two adult children, Roger M. Lebbin and Carole Sue Lebbin, were named as Trustees and are identified in the Policies as the owners.  (DE 124 ¶ 6; DE 172 ¶ 23; DE 124-10; DE 124-11).

The Policies are "second to die" polices, meaning that they insure two lives and pay a death benefit upon the death of the second insured to die.  (DE 124 ¶ 17; DE 172 ¶ 15).  Because the Policies each insure two lives, Transamerica's pricing and termination of the Policies was tied to a concept referred to as "Joint Equal Age."  (DE 124 ¶ 2; DE 172 ¶ 19).  The "Termination of Insurance" section states that the Policies terminate at the earliest of several instances, one of which is "the policy anniversary nearest Joint Equal Age 100."  (DE 124-10 at 19; DE 124-11 at 18).  The Policies define this term as "the adjusted age of the Joint Insureds which reflects a risk that would be equivalent to two people of the same age, class of risk and smoking status" but do not define the term "adjusted."  (DE 124-10 at 7; DE 124-11 at 8).

Bernice Lebbin passed away in 2015.  (DE 172 ¶ 38).  The Parties dispute the date on which Gary Lebbin and the Trust became aware that Transamerica intended to terminate the Policies.  Gary Lebbin turned 100 on September 6, 2017.  (DE 172 ¶ 39).  According to Defendant, the 1990 Policy terminated on July 9, 2017, the policy anniversary date nearest Joint

Equal Age 100 for the 1990 Policy, and the 1991 Policy terminated on December 20, 2017, the policy anniversary date nearest Joint Equal Age 100 for that Policy. (DE 172 ¶ 39).

This action was filed by Gary Lebbin and the Trust in the United States District Court for the District of Maryland on July 6, 2017. (DE 1). Defendant's Motion to Transfer was granted on April 30, 2018, and this case was transferred to this Court on May 1, 2018. (DE 24; DE 25). Plaintiff Gary Lebbin filed a Notice of Voluntary Dismissal with Prejudice on January 30, 2019, and this Court dismissed Gary Lebbin's claims on February 5, 2019, pursuant to Federal Rule 41(a)(2). (DE 102; DE 123). At this time, the Trust is the sole Plaintiff in this matter.

The Amended Complaint seeks relief on the following claims: declaratory judgment as to the terms of the Policies (Count I); breach of contract (Count II); breach of the covenant of good faith and fair dealing (Count III); reformation (Count IV); and rescission (Count V). (DE 158). Plaintiff's Motion for Summary Judgment addresses only the claim for breach of contract. Defendant's Motion for Summary Judgment seeks judgment in Defendant's favor on all claims.

## LEGAL STANDARD

"The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A disputed fact is "material" if it "might affect the outcome of the suit under the governing law." *Talavera v. Shah*, 638 F.3d 303, 308 (D.C. Cir. 2011) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)). A dispute over a material fact is "genuine" if it could lead a reasonable jury to return a verdict in favor of the nonmoving party. *See Scott v. Harris*, 550 U.S. 372, 380 (2007). "Credibility determinations, the weighing of the evidence, and the drawing of legitimate inferences from the facts are jury functions, not those of a judge at summary judgment. Thus, [the court] do[es] not determine the truth of the matter, but instead

3

decide[s] only whether there is a genuine issue for trial." *Barnett v. PA Consulting Group, Inc.*, 715 F.3d 354, 358 (D.C. Cir. 2013) (quoting *Pardo-Kronemann v. Donovan*, 601 F.3d 599, 604 (D.C. Cir. 2010)).

Under the summary judgment standard, the moving party bears the "initial responsibility of informing the district court of the basis for [its] motion, and identifying those portions of the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits which [it] believe[s] demonstrate the absence of a genuine issue of material fact." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). In response, the nonmoving party must "go beyond the pleadings and by [its] own affidavits, or depositions, answers to interrogatories, and admissions on file, 'designate' specific facts showing that there is a genuine issue for trial." *Id.* at 324 (internal citations omitted). If a party against whom a motion is filed fails to "establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial," summary judgment for the movant is warranted. *Celotex Corp.*, 477 U.S. at 322. The party moving for summary judgment bears the burden of establishing that there is insufficient evidence to support the non-moving party's case. *Id.* at 325. At the summary judgment stage, courts construe the facts in the light most favorable to the non-movant, and any doubts should be resolved against the moving party. *Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 157 (1970).

Where affirmative defenses are contested, however, a different analysis applies. Because a defendant bears the burden of proof on any affirmative defenses at trial, *Thorsteinsson v. M/V Drangur*, 891 F.2d 1547, 1550–51 (11th Cir. 1990), on a plaintiff's motion for summary judgment, the defendant bears the initial burden of showing that the affirmative defense is

applicable. *Blue Cross and Blue Shield v. Weitz*, 913 F.2d 1544, 1552 (11th Cir. 1990). Upon such a showing, the burden shifts to plaintiff regarding that affirmative defense. *Id.* at n.13.

## ANALYSIS

As this action was initiated in Maryland, the Court must first determine what law to apply. "It is well established that a transfer under § 1404(a) is generally 'but a change of courtrooms.'" *James Ventures, L.P. ex rel. Alpert v. Timco Aviation Servs., Inc.*, 315 F. App'x 885, 888 (11th Cir. 2009) (quoting *Van Dusen v. Barrack*, 376 U.S. 612, 641 (1964)). The transferee court is "obligated to apply the state law that would have been applied if there had been no change of venue." *Van Dusen*, 376 U.S. at 641. In diversity cases, this rule extends to state conflicts of law rules. *Klaxon Co. v. Stentor Electric Manufacturing Co.*, 313 U.S. 487, 496 (1941). Under Maryland's conflicts of law rules, procedural matters are governed by Maryland law and questions of substantive law are to be decided according to the law of the state where the cause of action accrued. *Doughty v. Prettyman*, 148 A.2d 438, 440 (Md. 1959).

Accordingly, as the Parties concede, this dispute is governed by Maryland procedural law and Florida substantive law.

## I.    Statute of Limitations

Defendant first argues that all of Plaintiff's claims are barred by the statute of limitations. The statute of limitations is a matter of procedure in Maryland. *Doughty*, 148 A.2d at 440 (citing *Restatement, Conflict of Laws*, Section 604 (1934)). Maryland requires a civil action to be filed "within three years from the date it accrues" unless another statutory provision provides otherwise. Md. Code, Cts. & Jud. Proc. § 5-101. Under Maryland law, an action typically accrues at the time of the wrong, and an action for breach of contract generally occurs when the contract is breached. *Poole v. Coakley & Williams Const., Inc.*, 31 A.3d 212, 236 (Md. 2011);

*Goodman v. Praxair, Inc.*, 494 F.3d 458, 465 (4th Cir. 2007). The state of Maryland has adopted the discovery rule, however, which tolls the accrual of the limitations period until the time the plaintiff discovers, or through the exercise of due diligence, should have discovered, the injury. *Frederick Road Limited Partnership v. Brown & Sturm*, 756 A.2d 963, 973 (Md. 2000) (citing *Hahn v. Claybrook*, 100 A. 83, 85–86 (Md. 1917)). Inquiry notice, as conceptualized under Maryland's discovery rule, "means having knowledge of circumstances which would cause a reasonable person in the position of the plaintiffs to undertake an investigation which, if pursued with reasonable diligence, would have led to knowledge of the alleged" injury. *O'Hara v. Kovens*, 503 A.2d 1313, 1324 (1986). Whether or not the plaintiff's failure to discover his cause of action was due to failure on his part to use due diligence "is ordinarily a question for the trier of facts." *Id.* at 1320.

Defendant argues that all of Plaintiff's claims accrued at the same time—when the Policies were executed—but I find that separate analysis is required for Plaintiff's breach claims and equitable claims.

With respect to the breach claims, Defendant's principal theory is that, if any breach occurred, it occurred when Gary Lebbin first received the Policies and their terms did not align with the alleged representations of Defendant's agents. While Plaintiff alleges that the Policies were "marketed, sold, and represented" as "for life," and while Gary Lebbin purchased the Policies based on "representations concerning [their] permanent nature," the written terms of the Policies indicate that they may terminate on "the policy anniversary nearest Joint Equal Age 100" and include no reference to the "permanent insurance" Gary Lebbin was allegedly promised. *Compare* Am. Compl. ¶¶ 18, 26 *with* DE 124-10 *and* DE 124-11. Defendant cites several "vanishing premium" insurance cases for the proposition that a plaintiff must be

considered on notice where the policy itself "contradicted and/or failed to incorporate the alleged representations." *Ruddy v. Equitable Life Assurance Soc'y of U.S.*, No. CIV. A. DKC 00-70, 2000 WL 964770, at *3 (D. Md. June 20, 2000); *Thelen v. Massachusetts Mut. Life Ins. Co.*, 111 F. Supp. 2d 688, 693 (D. Md. 2000). In *Ruddy* and *Thelen*, plaintiffs alleged that insurance companies deceptively marketed policies by using misleading illustrations to show how interest and dividends would be sufficient after a set number of years to cover the premium payments. In both cases the District Court found the contract claims barred on the theory that any breach occurred "when the written policy failed to incorporate the alleged promises made or, at the very latest, when [the insurer] demanded additional payments from Plaintiff to maintain the policy." *Ruddy*, 2000 WL 964770, at *5.

Plaintiff, conversely, argues that the earliest date the statute of limitations could have begun to run was August 9, 2016—the date on which Transamerica declared its intent to terminate the 1990 Policy on July 9, 2017 and the 1991 Policy on December 20, 2017. (DE 173-31). Plaintiff argues that *Ruddy* and *Thelen* are irrelevant because the Policies at issue in this matter *do not* contradict the insurer's representations. Plaintiff argues the terms of the contracts "repeatedly state, in unqualified language, that their death benefits will be paid upon the death of the last of the Joint Insureds to die." (Plaintiff's Motion for Summary Judgment, DE 113 at 3). To the extent they are not clear on this point, Plaintiff argues, they are at least ambiguous as a result of of internal inconsistencies arising from use of the term "Joint Equal Age," which is not defined and, they state, was not discussed with Gary Lebbin. (*Id.* at 9).

I find that *Ruddy* and *Thelen* are not applicable in this instance.[1] In those cases, "the alleged oral premises were made prior to the issuance of the written policies that clearly state that

---

[1] I also note that *Ruddy* and *Thelen* are not binding, as they are federal district court decisions

premiums are due for the life of the insured." *Thelen*, 111 F. Supp. 2d at 694.  In this action, however, Plaintiff's theory is that the Policies "were intended to, and by their terms do, provide permanent coverage for the lives of the Lebbins," or in the alternative, are ambiguous with respect to the termination of coverage.  (Am. Compl., DE 158 ¶¶ 72, 77).  If, when Gary Lebbin first received the Policies, he understood their terms to be consistent with the representations based on which he purchased the policies, it would be unjust and unreasonable to hold the Trust accountable, at this time, for a disjunction that Gary did not perceive.  Thus it appears that Defendant's first limitations argument cannot be answered without analysis of the merits of Plaintiff's breach claims.

Defendant's alternative limitations theory leads to the same (unsatisfying) result. Defendant states that, over three years before this action was filed, the trustees were aware that the Policies would terminate in the year their parents reached the age of 100, and that this knowledge constitutes inquiry notice that starts the clock on the statute of limitations.  In his deposition testimony, Roger Lebbin states that on June 10, 2014, Lisa Fleming, a policy manager employed by the Trust, sent Roger an email explaining that if one of his parents lived past age 100, Defendant would pay the Policies' cash value rather than the death benefit.  R. Lebbin Depo., DE 173-4 at 192–94.  Roger described receipt of this email as the "'aha' moment" in which "somebody lifted the curtain" and made him aware of "the age 100 problem." *Id.* at 193–94.  If Plaintiff had actual knowledge on June 10, 2014 that the Policies would terminate when one of the insureds turned 100, Defendant reasons, the statute of limitations must expire three years from that date—approximately one month prior to the initiation of this action in the

---

that cite not Maryland law as the basis for their reasoning but rather "vanishing premium" decisions of other federal courts.

District of Maryland.  Plaintiff argues in response that Fleming's description of the Policies was and is contrary to the death benefit provisions of the Policies.

For Fleming's email to have initiated the limitations period for the breach claims, as Defendant argues, either the email must have constituted anticipatory breach *or* it must have made Plaintiff aware of the discrepancy between the terms of the contracts and the seller's representations, as in *Ruddy*.   The former theory appears inapposite: Maryland recognizes anticipatory repudiation, *Friedman v. Katzner*, 114 A. 884, 886–87 (Md. 1921), but such a repudiation requires a party's refusal to perform to be "positive and unconditional," *C. W. Blomquist & Co. v. Capital Area Realty Inv'rs*, 311 A.2d 787, 791 (Md. 1973) (collecting authorities), and the email from Fleming, who is not affiliated with Defendant, does not constitute such "positive and unconditional" refusal to perform by Defendant.  The latter theory depends on the existence of a discrepancy between the Policies as written and Defendant's oral representations regarding their duration, but Plaintiff consistently maintains that there is no discrepancy, as the Policies are either clear or ambiguous with respect to termination.

Accordingly, the question of *when* the Policies were breached in this action necessarily depends on *whether* they were breached.  The Court will proceed to analyze the Parties' cross motions for summary judgment on Plaintiff's claim for breach of contract.  If the terms of the Policies indicate that it does not terminate until the deaths of the insureds, or if it is ambiguous, the statute of limitations will not have begun to run until August 9, 2017—the date on which Defendant informed Plaintiff that it intended to terminate the Policies in July and December of 2017.  (DE 173-31).  Otherwise, however, the three-year limitations period will have elapsed and Plaintiff's breach claims will be foreclosed.[2]

---

[2] Defendant also contends, in a footnote, that the annual policy statements, such as the statements

With respect to Plaintiff's equitable claims, however, Roger Lebbin's "aha moment" is dispositive.    Plaintiff's reformation claim alleges that "Transamerica, through the misrepresentations and other inequitable conduct alleged in paragraphs 16-30 herein, induced the Lebbins to take out the Policies under the mistaken belief that they were purchasing and paying for permanent life insurance . . . ." (Am. Compl. ¶ 90).  The Trust's rescission claim is based on "misrepresentations, unfair and deceptive practices, inequitable conduct, negligence, mutual and unilateral mistake, and/or ambiguities," as well as "the Policies' failure to define key terms." (Am. Compl. ¶¶ 99–100).   Regardless of when or if the Policies were breached, these claims accrued, at the latest, on the date of the "aha moment"—the Trust did not need to wait until Transamerica actually or anticipatorily terminated the Policies in order to bring these claims. Because the three-year statute of limitations began to run on the date of Fleming's email, June 10, 2014, it expired in June of 2017, approximately one month prior to the date on which this action was initiated (July 6, 2017).   (*See* DE 1). Accordingly, summary judgment must be granted in Defendant's favor on Plaintiff's claims for reformation and rescission.

## II.    Breach of Contract

Defendant moves for summary judgment on Plaintiff's breach of contract claim on the basis that the Policies were administered and terminated according to their terms.  Plaintiff moves for summary judgment on the grounds that 1) the Policies plainly state that the death

---

sent in 2006 and 2010, informed Plaintiff of the potential maturity of the policies.  The 2006 statement, for example states: "Based on these current rate assumptions your policy would remain in force until your policy anniversary date in DEC, 2017.  At that time, your policy would mature for its cash value." (DE 173-19 at 3).  Plaintiff argues that 1) the language of a statement cannot prevail over express policy language to the contrary, and that 2) the portion of the 2006 statement on which Defendant bases this argument, a "Policy Outlook" section pertaining to hypothetical scenarios based on prevailing interest rates, did not adequately provide notice of intent to breach. These competing contentions regarding the policy statements do not affect my decision to defer ruling on the statute of limitations issue, as the text of the Policies will control either way.

benefit will be paid upon the death of the last of the two insureds to die, and to the extent other provisions appear contradictory, the language providing coverage prevails, and 2) the phrase "Joint Equal Age," as used in the Policies, is either ambiguous, in which case it must be construed in favor of the insured, or incomprehensible, in which case it may not be enforced as a grounds for termination.

The interpretation of an insurance contract is a matter for the court. *Gulf Tampa Drydock Co. v. Great Atlantic Ins. Co.,* 757 F.2d 1172 (11th Cir. 1985); *Smith v. State Farm Mutual Automobile Ins. Co.,* 231 So.2d 193 (Fla. 1970). Under Florida law, an insurance policy should be construed in its entirety and given the construction which reflects the intent of the parties. *Landress Auto Wrecking Co. v. United States Fidelity & Guaranty Co.,* 696 F.2d 1290, 1291 (11th Cir. 1983) (applying Florida law). Insurance contracts are liberally construed in favor of coverage, *Arnold v. Beacon Insurance Co. of America,* 687 So.2d 843 (Fla. Dist. Ct. App. 1996), and ambiguous provisions must be construed against the drafter, the insurance carrier. *Gilmore v. St. Paul Fire & Marine Insurance,* 708 So.2d 679, 680 (Fla. Dist. Ct. App. 1998) (citing *Ellsworth v. Insurance Company of North America,* 508 So.2d 395, 400 (Fla. Dist. Ct. App. 1987)). Ambiguity exists in an insurance policy only when its terms make the contract susceptible to different reasonable interpretations. *Blue Shield of Florida, Inc. v. Woodlief,* 359 So.2d 883, 884 (Fla. Dist. Ct. App. 1978). Ambiguity is not invariably present when analysis is required to interpret the policy, *id.,* and Florida law cautions that courts must not add meaning to the terms of an insurance policy to create an ambiguity where none exists. *City of Delray Beach, Fla. v. Agric. Ins. Co.,* 85 F.3d 1527, 1531 (11th Cir. 1996) (citing *Excelsior Ins. Co. v. Pomona Park Bar & Package Store,* 369 So.2d 938 (Fla. 1979)).

### A. Ambiguity by Inconsistency

Plaintiff first observes that the Policies, which contain identical language, state in at least three locations that death benefits are payable upon the death of the surviving joint insured. *See* DE 124-10 at 8 ("Who Receives the Death Benefit -- When the Survivor dies, we will pay the death benefit to the beneficiary."); *id.* ("PAYMENT OF THE DEATH BENEFIT: Proof of Death -- Any death Benefit payable because the death of the Survivor will be paid when we receive due proof of the death of both Joint Insureds."); *id.* at 19 ("SETTLEMENT PROVISIONS: When the survivor dies, we will pay the death benefit in a lump sum unless you or the beneficiary choose a settlement option.").   Plaintiff then observes that these broad and unqualified statements of coverage are inconsistent with the Termination of Insurance section under the GENERAL PROVISIONS header.  That section states, in full:

> Termination of Insurance -- The policy will terminate at the earliest of the following dates:
> 1. the date of surrender; or
> 2. *the policy anniversary nearest Joint Equal Age 100; or*
> 3. the date the Policy Split Option is exercised if the Policy split Option endorsement, is a part of the policy; or
> 4. the date of lapse.

(DE 124-10 at 19; DE 124-11 at 18) (emphasis added).  Plaintiff argues that the Policies are rendered ambiguous by this inconsistency, and asks this court to recognize Florida precedent indicating that ambiguous terms are to be construed in favor of the insured. *See, e.g., Gilmore v. St. Paul Fire & Marine Ins.*, 708 So.2d 679 (Fla. Dist. Ct. App. 1998).

Plaintiff's inconsistency argument is rejected.  One of the examples Plaintiff cites is qualified in such a way that it does not appear to contradict the Termination of Insurance section: "Proof of Death -- *Any* death benefit payable . . . ." (DE 124-10 at 8) (emphasis added).  To the extent the other two examples, which are found under the headers "The Beneficiary" and

"Settlement Provisions" (DE 124-10 at 8, 19), are inconsistent with the termination provisions, the termination provisions must prevail. "[S]imply because one provision gives a general grant of coverage and another provision limits this coverage does not mean there is an ambiguity or inconsistency between the two." *Ajax Bldg. Corp. v. Hartford Fire Ins. Co.*, 358 F.3d 795, 799 (11th Cir. 2004) (citing *Cont'l Corp. v. Aetna Cas. & Sur. Co.*, 892 F.2d 540, 546 (7th Cir. 1989)). "This is the very nature of an insurance contract; exclusions in coverage are expressly intended to modify coverage clauses and to limit their scope." *Id.* The Termination of Insurance section, which is nested within the GENERAL PROVISIONS section, specifically enumerates four situations in which the policies will terminate. Florida law restrains courts from adding meaning to policy terms to create an ambiguity where none exists, *City of Delray Beach*, 85 F.3d at 1531, and it would strain credulity to read two scattered references to the payment of a death benefit, found within sections focused on the identity of the beneficiary and the Policies' settlement provisions, as overriding the generally-applicable and explicitly listed termination provisions.

### B. Ambiguity by Differing Interpretations or by Incomprehensibility

Plaintiff alternatively asks the Court to find that the term "Joint Equal Age," as used in the termination provisions, is either ambiguous because it is subject to differing reasonable interpretations or is unenforceable because it is incomprehensible. The Policies define "Joint Equal Age" as "the adjusted age of the Joint Insureds which reflects a risk that would be equivalent to two people of the same age, class of risk and smoking status," but they do not define the term "adjusted" as used in this provision. (DE 124-10 at 7). As "adjusted age" lacks plain or common meaning, Plaintiff asks the Court to derive ambiguity from the absence of a definition. As written, Plaintiff argues, the Policies do not provide details as to *who* adjusts the

ages of the Joint Insureds, *when* the adjustments are made, or *how* the adjustments are made. Plaintiff's proffered alternative interpretation is that increasing the "Joint Equal Age" of the insureds requires Defendant to actively make a determination as to any adjustments of the "Joint Equal Age" and then provide notice of that decision to the insureds. Plaintiff thus contends that Defendant was required to actively make adjustments prior to terminating the Policies. Additionally, Plaintiff argues that an internal implementation memorandum created by Defendant highlights Defendant's failure to clearly describe Joint Equal Age in the Policies.

Defendant, for its part, argues that the plain language of the Policies reflects the Joint Equal Age of the insureds, that Plaintiff's proposed alternative interpretation is unreasonable, and that extrinsic evidence resolves any ambiguity in Defendant's favor. I will address these arguments in turn.

With respect to the plain language of the Policies, I first observe that the term "Joint Equal Age" does not appear to be commonly used. I am aware of no judicial decisions in Florida—or any other state, for that matter—that address the interpretation of such a provision.[3] Defendant does not appear to contest this, but argues that the term must be read—and can be understood—in the broader context of the Policies. Defendant notes that the Policy Data pages included in each of the Policies indicate that the Joint Equal Age was 73 at the time of the issuance of the 1990 Policy and 74 at the time of the issuance of the 1991 Policy (DE 124-10 at 4; DE 124-11 at 5), and argues that if the Joint Equal Age did not increase each year, several provisions of the Policies—such as the promise to pay the death benefit "if both Joint Insureds die before the policy anniversary nearest Joint Equal Age"—would be rendered meaningless.

---

[3] As Plaintiff points out, Defendant's own actuarial expert witness David K. Sandberg stated in his testimony that he had only ever heard the term "kind of in passing" and that he had never seen the concept used in an insurance policy before. (DE 124-26, 146:9–147:21).

This argument fails: that the Joint Equal Age of the Joint Insureds was known at the time the Policies were executed does not necessarily give rise to the knowledge that the Joint Equal Age increases by one every year. Two data points, on their own, are not sufficient to establish a trend to the degree of certainty needed in this situation.

Defendant next contends that Plaintiff's proffered interpretation of the provision tortures the language of the Policies in order to create confusion where none exists:

> The word "adjusted" is a common English word used in its ordinary sense in the Policies. It is the past-tense of the verb "adjust" which means "to change so as to fit, conform, make suitable. *Webster's New World College Dictionary* (5th ed. 2015). Consistent with the dictionary definition of "adjusted," the Joint Insured's ages were changed to one age to "make suitable" a joint age that could be used to administer a life insurance policy insuring two lives. The 1990 Policy was issued at Joint Equal Age 73, which was the age of the Lebbins on their respective birthdays in 1990. And the 1991 Policy was issued at Joint Equal Age 74, which was the age of the Lebbins on their respective birthdays in 1991. The word "adjusted" requires no further definition.

(DE 141 at 15). I must disagree with the latter assessment. If Policies articulated that the only adjustment involved in the calculation of the Joint Equal Age was that the Joint Insured's ages were changed to a single age—the age of the Lebbins on their respective birthdays in a given calendar year—for ease of administering the Policies, then this case would be easily resolved. The Policies do *not* articulate this, however, defining Joint Equal Age only as "the adjusted age of the Joint Insureds which reflects a risk that would be equivalent to two people of the same age, class of risk and smoking status" and stating that the Policies may terminate at "the policy anniversary nearest Joint Equal Age 100." (DE 124-10 at 7, 19). "Adjusted," as used in this context, is not sufficient to explain itself on its own: it is a truth universally acknowledged that a verb, used in a sentence to express action, must be in want of a subject. The failure to define or otherwise elucidate the meaning of "adjusted" renders the Policies' definition of "Joint Equal Age" deficient. While "[t]he absence of a definition does not create ambiguity per se," such an

absence can certainly militate toward a finding of ambiguity where, as here, the absence leaves key questions unanswered and creates the potential for multiple interpretations. *Dahl-Eimers v. Mut. of Omaha Life Ins. Co.*, 986 F.2d 1379, 1384 (11th Cir. 1993) (determining district court erred by concluding term "experimental" was not ambiguous and noting that the disputed insurance policy did "not clearly specify who will determine whether a treatment is considered experimental or how that determination will be made"). In light of the lack of information in the Policies, Plaintiff's proffered interpretation—that adjustment of the "Joint Equal Age" of the insureds required Defendant to actively adjust the ages and provide notice of such adjustments to the insureds—appears reasonable.[4]

Defendant additionally argues that, to the extent the Court deems it necessary or appropriate to consider extrinsic evidence, the internal implementation memorandum *resolves* any ambiguity and that several other pieces of extrinsic evidence show that the contracting parties intended for the Policies to mature and terminate if Gary Lebbin attained the age of 100. The Florida Supreme Court has decidedly foreclosed the introduction of extrinsic evidence to resolve ambiguities in life insurance contracts, however. *See Washington Nat. Ins. Corp. v. Ruderman*, 117 So. 3d 943, 952 (Fla. 2013) (answering in negative the following question certified by the Eleventh Circuit: "If an ambiguity exists in this insurance policy—as we understand that it does—should courts first attempt to resolve the ambiguity by examining available extrinsic evidence?"). Plaintiff provides no explanation or legal justification as to why the implementation memorandum should be permitted to *demonstrate* ambiguity when it would

---

[4] Defendant's ancillary argument here—that Plaintiff's interpretation is unreasonable because it does not address how the Joint Equal Age can be less than 100 considering that Gary Lebbin is 101 and Bernice Lebbin is deceased—is also rejected, as it misses the same point: without information as to how the adjustment process works, Plaintiff is unable to know whether or how the adjustment affects Gary Lebbin's "Joint Equal Age."

surely be barred if introduced to *resolve* ambiguity.  Accordingly, the implementation memo proffered by Plaintiff is rejected, as is the extrinsic evidence advanced by Defendant.

In conclusion, I find the policies are rendered ambiguous by the incomprehensibility of the term "Joint Equal Age" as used in the termination of insurance provision.  The Policies state that they may terminate on "the policy anniversary nearest Joint Equal Age 100," but the definition of the term provided by the policies involves another term, "adjusted age," which is not defined by the policy. In the absence of a definition, plainly apparent meaning, or sufficient contextual indicators in the Policies themselves, Plaintiff's proposed alternative interpretation—that "adjusted age" indicated some type of active adjustment process by Defendant—appears reasonable.  Where a provision of a life insurance contract is subject to two or more interpretations, it is ambiguous. *Woodlief*, 359 So.2d at 884.  Extrinsic evidence cannot be admitted to resolve such an ambiguity. *Ruderman*, 117 So. 3d at 952.  And where an insurance policy is ambiguous, it must be construed against the drafter and thus in favor of coverage. *Gilmore*, 708 So.2d at 680.  Defendant did not engage in any type of process to adjust the Lebbins' Joint Equal Age prior to the dates on which it terminated the contracts, and the termination thus constitutes a breach.  Because this lawsuit was initiated prior to Defendant's termination of the Policies in 2017, Plaintiff's breach claim is not barred by the statute of limitations. *See supra*, Section I.  Accordingly, summary judgment must be granted in favor of Plaintiff on its claim for breach of contract.

### III.    Breach of the Covenant of Good Faith and Fair Dealing.

Defendant next moves for summary judgment on Plaintiff's claim for breach of the implied covenant of good faith and fair dealing.

"Under Florida law, every contract contains an implied covenant of good faith and fair dealing, requiring that the parties follow standards of good faith and fair dealing designed to protect the parties' reasonable contractual expectations." *Centurion Air Cargo, Inc. v. United Parcel Serv. Co.*, 420 F.3d 1146, 1151 (11th Cir. 2005) (citing *Cox v. CSX Intermodal, Inc.*, 732 So.2d 1092, 1097 (Fla. Dist. Ct. App. 1999). Plaintiff alleges that Defendant owed a duty to act in good faith with respect to coverage under the Policies, and that Defendant breached the covenant 1) by terminating the policies prior to Gary Lebbin's death and without grounds under the terms of the Policies and 2) by "abusing any power it had to make a discretionary decision under the Policies without defined standards (such as adjusting to Joint Equal Age 100)." (Am. Compl. ¶¶ 82–84).

Defendant seeks summary judgment in its favor on this claim on the sole basis that a claim for a breach of the implied covenant of good faith and fair dealing cannot be maintained in the absence of a breach of an express term of a contract, and because Plaintiff's claim for breach of contract must fail, Plaintiff's good faith and fair dealing claim must also fail. While Defendant correctly restates Florida's prohibition on breach of implied covenant of good faith and fair dealing claims independent of breach of contract claims, *Centurion Air Cargo*, 420 F.3d at 1152, Plaintiff's claim for breach of contract has not failed, however. The question of whether Defendant acted in good faith remains a live question of fact to be resolved at trial. *Allapattah Servs., Inc. v. Exxon Corp.*, 61 F.Supp.2d 1300, 1303 (S.D. Fla. 1999) ("Whether the covenant has been breached is generally a question of fact."). Accordingly, summary judgment must be denied on this count.

## IV.    Declaratory Relief

With respect to Plaintiff's claim for declaratory relief (Count I), Defendant argues that the claim is moot.  Defendant also argues that summary judgment must be entered in its favor on this claim on the basis that it improperly seeks adjudication of other claims raised in the Complaint.

### A.  Mootness

The Declaratory Judgment Act grants to federal district courts the power to "declare the rights and other legal relations of any interested party seeking such declaration, whether or not further relief is or could be sought."  28 U.S.C. § 2201.  Declaratory judgment actions must be predicated on an "actual controversy" between the parties.  *Aetna Life Ins. Co. of Hartford, Conn. v. Haworth*, 300 U.S. 227, 239–40 (1937).  This term holds the same meaning as the cases and controversies requirement of Article III to the United States Constitution: an "actual controversy" exists where "there is a substantial controversy, between parties having adverse legal interests, of sufficient immediacy and reality to warrant the issuance of a declaratory judgment."  *Md. Cas. Co. v. Pac. Coal & Oil Co.*, 312 U.S. 270, 273 (1941).  Ordinarily, a controversy is not sufficiently immediate or real where the parties' dispute is only hypothetical, abstract, academic, or moot.  *See Aetna Life Ins. Co.*, 300 U.S. at 240–41 (citing *United States v. Alaska S.S. Co.*, 253 U.S. 113, 116 (1920)).

Defendant rests its argument on *Gagliardi v. TJCV Land Trust et al.*, a case in which residents appealed the district court's dismissal of their claims that several provisions of the federal and state constitutions were violated by the City of Boca Raton's approval of construction of a religious center near their homes.  889 F.3d at 734–35.  Because a Florida court invalidated the planned construction before the Eleventh Circuit issued its decision, the Eleventh

Circuit held that the case—including the plaintiffs' claims for declaratory relief—was moot. "A declaratory judgment devoid of 'sufficient immediacy and reality'" cannot render a case justiciable.'" *Id.* (citing *Preiser v. Newkirk*, 422 U.S. 395, 402 (1975)). "Here there is nothing but the fear that the challenged conduct may recur in some unstated form at an unknown time and place." *Id.*

The declaratory judgment claim currently before the Court does not want for immediacy or reality. While the Policies were terminated during the pendency of this action, the termination has not rendered hypothetical or moot the Parties' dispute over the contract. *See Blitz Telecom Consulting, LLC v. Peerless Network, Inc.*, 151 F. Supp. 3d 1294, 1303 (M.D. Fla. 2015) (denying summary judgment on declaratory judgment claims where the parties contested their rights and remedies under a terminated contract and the extent to which a recent judicial decision affected those rights and remedies). *See also Chafin v. Chafin*, 568 U.S. 165, 172 (2013) (emphasizing that the doctrine of mootness is limited to cases where "it is impossible for a court to grant any effectual relief," explaining that "[a]s long as the parties have a concrete interest, however small, in the outcome of the litigation, the case is not moot"). Indeed, I note that one of the declarations Plaintiff seeks states that "Transamerica's purported termination of the Policies is null and without effect." (Am. Compl. ¶ 67.i). Summary judgment on Plaintiff's declaratory judgment claim shall not be entered in Defendant's favor on the basis of mootness.

**B. Discretion**

Summary judgment shall be entered in Defendant's favor on this claim as a matter of discretion, however. While the Declaratory Judgment Act allows a district court to declare the legal rights and obligations of parties, the power to render a declaratory judgment is discretionary, and a court should have a good reason for declining to consider a declaratory

judgment claim. *See Old Rep. Union. Ins. Co. v. Tillis Trucking Co., Inc.*, 124 F.3d 1258, 1260 (11th Cir. 1997) ("Consistent with the nonobligatory nature of the remedy, a district court is authorized, in the sound exercise of its discretion, to stay or to dismiss an action seeking a declaratory judgment."); *Angora Enters., Inc. v. Condo. Ass'n of Lakeside Vill., Inc.*, 796 F.2d 384, 387 (11th Cir. 1986) (per curiam).

Precedent and the Federal Rules agree that "a request for declaratory relief may be considered independently of whether other forms of relief are appropriate." *Powell v. McCormack*, 395 U.S. 486, 518, 89 S. Ct. 1944, 1962, 23 L. Ed. 2d 491 (1969) (citations omitted); Fed. R. Civ. P. 57. But in this District, it is well established that "[a] court must dismiss a claim for declaratory judgment if it is duplicative of a claim for breach of contract and, in effect, seeks adjudication on the merits of the breach of contract claim." *Miami Yacht Charters, LLC v. Nat't Union Fire Ins. Co.*, Case No. 11-21163-CIV, 2012 WL 1416428 at *2 (S.D. Fla. Apr. 24, 2012). "[A] trial court should not entertain an action for declaratory judgment on issues which are properly raised in other counts of the pleadings and already before the court, through which the plaintiff will be able to secure full, adequate and complete relief." *Fernando Grinberg Trust Success Int. Prop. LLC v. Scottsdale Ins. Co.*, Case No. 10-20448-CIV, 2010 WL 2510662 at *1 (S.D. Fla. June 21, 2010) (quoting *McIntosh v. Harbour Club Villas*, 468 So.2d 1075, 1080–81 (Fla. Dist. Ct. App. 1985) (Nesbitt, J. specially concurring). *See also Se. Distributors, Inc. v. United Specialty Inc. So.*, 16-24549-CIV, 2017 WL 960300 at *5 (S.D. Fla. Mar. 13, 2017) (dismissing count for declaratory judgment and noting "several courts in this district have dismissed claims seeking a declaratory judgment when the relief sought in the declaratory judgment claim is duplicative of or subsumed by the claims advanced in other counts of the complaint"); *Crossen v. USAA Causalty Ins. Co.*, No. 9:18-CV-81453,

2019 WL 1258739, at *3 (S.D. Fla. Mar. 19, 2019) (dismissing, on the basis of the Court's discretion over declaratory judgment actions, plaintiffs' declaratory judgment claim because it could be fully vindicated through their parallel breach of contract claim).

The ten declarations sought by Count I of the Amended Complaint include, *inter alia*, a declaration that Defendant's failure to define the word "adjusted" renders the term "Joint Equal Age" ambiguous and a declaration that Defendant's purported termination of the Policies is null and without effect. (Am. Compl. ¶¶ 67.a–67.j). The requested declarations are almost entirely duplicative of the arguments in Plaintiff's claim for breach of contract. Because these requests may be better adjudicated through resolution of Plaintiff's claim for breach—and indeed, because they have already been adjudicated through such a resolution, *see supra* Section II—I decline to exercise discretion to consider Plaintiff's declaratory judgment claim. Summary judgment is awarded in Defendant's favor on Count I of the Amended Complaint.

## CONCLUSION

In light of the foregoing, it is **ORDERED AND ADJUDGED** that

(1) Plaintiff's Motion for Summary Judgment (DE 113) is **GRANTED**. Summary judgment is **ENTERED** in Plaintiff's favor on Plaintiff's claim for breach of contract (Count II).

(2) Defendant's Amended Motion for Summary Judgment (DE 171) is **GRANTED IN PART** and **DENIED IN PART**.

(3) With respect to Plaintiff's claims for declaratory judgment (Count I), reformation (Count IV), and rescission (Count V), Defendant's Amended Motion for Summary Judgment is **GRANTED** and summary judgment is **ENTERED** in Defendant's favor.

(4) Defendant's Motion for Summary Judgment is **DENIED** with respect to Plaintiff's claims for breach of contract (Count II) and breach of the covenant of good faith and fair dealing (Count III).

(5) Calendar Call remains scheduled for July 31, 2019, and trial remains set for the two-week period beginning on August 5, 2019.  (*See* DE 165).  The issues remaining for adjudication at trial are Plaintiff's claim for breach of the covenant of good faith and fair dealing (Count III) and damages.

**SIGNED** in Chambers at West Palm Beach, Florida, this _19_ day of July, 2019.

DONALD M. MIDDLEBROOKS
UNITED STATES DISTRICT JUDGE

Copies to:      Counsel of Record